UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DORIS REDFERN-WALLACE,

|                              |                    |                        |
|------------------------------|--------------------|------------------------|
|                              | Plaintiff,         | REPORT                 |
|                              |                    | and                    |
|                    v.        |                    | RECOMMENDATION         |
|                              |                    |                        |
| BUFFALO NEWS, and            |                    | 12-CV-00471V(F)        |
| CWA LOCAL 81,                |                    |                        |
|                              |                    |                        |
|                              | Defendants.        |                        |

_____

APPEARANCES:        DORIS REDFERN-WALLACE, *Pro Se*
                    796 West Avenue
                    Buffalo, New York  14213

                    BOND, SCHOENECK & KING, PLLC
                    Attorneys for Defendant Buffalo News
                    SCOTT PATRICK HORTON, and
                    MICHAEL E. HICKEY, of Counsel
                    Avant Building
                    200 Delaware Avenue
                    Suite 900
                    Buffalo, New York 14075

                    ROSENBLATT & GOSCH PLLC
                    Attorneys for Defendant CWA Local 81
                    RICHARD ROSENBLATT, of Counsel
                    8085 East Prentice Avenue
                    Greenwood Village, CO 80111

                    REDEN & O'DONNELL, LLP
                    Attorneys for Defendant CWA Local 81
                    ROBERT J. REDEN, of Counsel
                    135 Delaware Avenue
                    Suite 410
                    Buffalo, New York  14202

## JURISDICTION

This action was referred to the undersigned by Honorable Richard J. Arcara on

October 29, 2014, for all pretrial matters including preparation of a report and

recommendation on dispositive motions.[1]  The matter is presently before the court on

motions for summary judgment filed on October 31, 2014 by Defendants Buffalo News

(Doc. No. 99), and CWA Local 81 (Doc. No. 100).

## BACKGROUND

Plaintiff Doris Redfern-Wallace ("Plaintiff"), commenced this employment

discrimination action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§

2000e, *et. al* ("Title VII"), on May 22, 2012, against Defendants including her former

employer The Buffalo News ("The News"), and her former labor bargaining unit

Defendant Buffalo Mailers Union No. 81, CWA ("the Union").  On October 18, 2012,

Plaintiff filed a Supplemental Complaint (Doc. No. 8).  Both The News and the Union

moved to dismiss for failure to state a claim by motions filed, respectively, February 7,

2013 (Doc. No. 11), and February 20, 2013 (Doc. No. 19).  By Decision and Order filed

July 17, 2013 (Doc. No. 40) ("July 17, 2013 D&O"), the motions to dismiss were granted

in part and denied in part, with Plaintiff directed to file an amended complaint in which

the only claims for relief which could be pleaded included (1) an unfair labor practice

claim against The New pertaining to the termination of Plaintiff's employment on

January 9, 2012; (2) a specific Title VII claim against The New for events occurring on

or after December 10, 2010; and (3) a breach of the duty of fair representation claim

against the Union for events occurring on or after September 20, 2011, related to the

termination of Plaintiff's employment and the Union's investigation of the same.  July 17,

2013 D&O at 10.  Plaintiff was further instructed that for each of the three claims she

was permitted to plead Plaintiff was to present "an organized, chronological and clear"

---

[1] On March 7, 2016, the case was reassigned to Honorable Lawrence J. Vilardo (Doc. No. 109).

list or description of the asserted violations and relevant facts. *Id.* In her Amended Complaint filed July 26, 2013 (Doc. No. 41) ("Amended Complaint"), although Plaintiff does specify her Title VII claim against The New is based on race, Amended Complaint ¶ 1, the Amended Complaint otherwise does not allege with the desired clarity the claims Plaintiff was permitted to replead.

On October 31, 2014, the instant motions for summary judgment were filed by The News (Doc. No. 99) ("The News' Motion"), and the Union (Doc. No. 100) ("the Union's Motion") (together, "the Motions"). The News' Motion is supported by the attached Statement of Material Facts Pursuant to Local Rule 56.1 (Doc. No. 99-1) ("The News' Statement of Facts"), the Attorney Affidavit of Scott P. Horton, Esq. (Doc. No. 99-2) ("Horton Affidavit"), attaching exhibits A through E (Docs. Nos. 99-3 through 99-7) ("Horton Affidavit Exh(s). __"), the Affidavit of Lawrence Bayerl (Doc. No. 99-8) ("Bayerl Affidavit"), attaching exhibits A and B (Doc. No. 99-9) ("Bayerl Affidavit Exh(s). __"), the Affidavit of Aaron Gallivan (Doc. No. 99-10) ("Gallivan Affidavit"), attaching exhibits A through C (Doc. No. 99-11) ("Gallivan Affidavit Exh(s). __"), the Memorandum of Law in Support of Defendant The Buffalo News, Inc.'s Motion for Summary Judgment (Doc. No. 99-12) ("The News' Memorandum"), and the Notice to *Pro Se* Litigants (Doc. No. 99-13), advising Plaintiff that her failure to respond in opposition to The News' Motion may result in judgment be granted in favor of The News. The Union's Motion is supported by the attached CWA Local 81's Statement of Material Facts (Doc. No. 100-1) ("Union's Statement of Fact"), the Union's Appendix to Local Rule 56 Statement of Material Facts - Declarations (Doc. No. 100-2) ("Union's Declarations"), the Union's Appendix to Local Rule 56 Statement of Material Facts – Depositions (Doc. No. 100-3)

("Union's Depositions"), the Union's Appendix to Local Rule 56 Statement of Material

Facts – Deposition Exhibits Part 1 (Doc. No. 100-4) ("Union's Deposition Exhibits Pt.

1"), the Union's Appendix to Local Rule 56 Statement of Material Facts – Deposition

Exhibits Part 2 (Doc. No. 100-5) ("Union's Deposition Exhibits Pt. 2"), the Union's

Compendium of Unpublished Cases (Doc. No. 100-6) ("Union's Compendium of

Unpublished Cases"), the Memorandum in Support of CWA Local 81's Motion for

Summary Judgment (Doc. No. 100-7) ("Union's Memorandum"), and the Notice to *Pro

Se* Litigants (Doc. No. 99-13), advising Plaintiff that her failure to respond in opposition

to the Union's Motion may result in judgment granted in favor of the Union.

In opposition to the Motions, Plaintiff electronically filed on November 12, 2014,

her "Response to Defendants [*sic*] Motion for Summary Judgement [*sic*]" (Doc. No. 101)

("Plaintiff's Response"), and manually filed a box of exhibits (Doc. No. 102) ("Plaintiff's

Exh(s). __").  On December 1, 2014, The News filed the Reply Memorandum of Law in

Further Support of Defendant The Buffalo News, Inc.'s Motion for Summary Judgment

(Doc. No. 104) ("The News' Reply"), attaching the Attorney Reply Affidavit of Scott P.

Horton, Esq. (Doc. No. 104-1) ("Horton Reply Affidavit").  Also filed on December 1,

2014, was CWA Local 81's Reply Memorandum of Law in Support of Its Motion for

Summary Judgment (Doc. No. 105) ("Union's Reply").  On December 4, 2014, Plaintiff,

without seeking permission from the court, filed a single page document entitled "Motion

to Ask Court to Comply with Rule 56 of Civil Procedure (Affidavit) Notarization" (Doc.

No. 106) ("Plaintiff's Sur-Reply"), requesting that Plaintiff's failure to strictly comply with

certain requirements of Fed.R.Civ.P. 56 ("Rule 56"), such as the requirement that

Plaintiff file a notarized affidavit opposing summary judgment, be excused in light of

Plaintiff's *pro se* status.  Oral argument was deemed unnecessary.

Based on the following, the Motions seeking summary judgment should be

GRANTED.

## **FACTS**[2]

On August 28, 1993, Plaintiff Doris Redfern-Wallace ("Plaintiff" or "Redfern-

Wallace"), who is African-American, commenced employment with Defendant The

Buffalo News ("The News"), working in the mailroom as an apprentice, advancing to a

helper and then in 2004 to journeyperson, a position for which the job responsibilities

included working on the assembly line, stacking waste paper, and wrapping bundles of

newspapers.  For the duration of her employment as a mailroom employee, Plaintiff was

a member of Defendant Buffalo Mailers Union No. 81 CWA ("the Union" or "Local M-

81").  The News has a collective bargaining agreement ("CBA")[3] with the Union which

governs the terms and conditions of the Union members' employment.  All mailroom

employees are required to abide by workplace rules ("Mailroom Rules"),[4] established by

The News requiring, *inter alia*, "[e]mployees shall not engage in horseplay or any other

distracting/disruptive behavior.  It is not acceptable to yell, curse or facilitate a

confrontation."  Mailroom Rule 5.  Additionally, the Mailroom Rules require that

"[e]mployees must avoid all types of harassment of others including verbal and/or

physical threats and abuse, and sexual or racist harassment/remarks."  Mailroom Rule

10.  Further, "[t]he use of CELL PHONES (talking, texting, time etc), BLUETOOTHS,

---

[2] Taken from the pleadings and motion papers filed in this action.
[3] Horton Affidavit Exh. C.
[4] Gallivan Affidavit Exh. A.

headphones, or any other device that may impede or distract an employees' [*sic*] ability to do his/her job is prohibited.  NO ONE, including lead people, should be using these devices."  Mailroom Rule 6 (capitalization and underlining in original).  At all times relevant to this action, other mailroom employees of The News included Mailroom Manager Aaron Gallivan ("Gallivan"), and Assistant Mailroom Manager Chad Johnson ("Johnson").  Plaintiff, as a mailroom journey person was supervised by and received direction from Gallivan and Johnson, as well as from two categories of lower-level supervisors, *i.e.*, "blue shirts" and "lead persons."  As Mailroom Manager, Gallivan supervised all mailroom employees, disciplining them when necessary.  At all times relevant to this action, Lawrence Bayerl ("Bayerl") was General Counsel and Director of Human Resources for The News.  The News maintains a written Equal Employment Opportunity and Anti-Harassment Policy ("Anti-Harassment Policy"),[5] with which Plaintiff had been provided.  As relevant, the Anti-Harassment Policy defines prohibited forms of harassment to include

> conduct which denigrates or shows hostility or aversion to an individual because of . . . her . . . race, . . . color, . . . gender, . . . age, . . . marital status, or predisposing genetic characteristics, . . and which
>> a)  Has the purpose or effect of creating an intimidating, hostile, or offensive work environment; or
>> b)  Has the purpose or effect of unreasonably interfering with an individual's work performance; or
>> c)  Otherwise adversely affects an individual's employment opportunities.

Anti-Harassment Policy § B (capital letters in original).

On Plaintiff's birthday on September 20, 2011, Plaintiff began her shift at 9:00 P.M., and later ate lunch with her co-workers, including Plaintiff's friend Karen Greiner ("Greiner").  While at lunch, Plaintiff perceived that some of her other co-workers were

---

[5] Horton Affidavit Exh. D.

calling Plaintiff names including "chicken head" and "chia pet."  Amended Complaint ¶ 2.

Plaintiff asked why Greiner laughed with their co-workers instead of defending Plaintiff,

who was supposed to be her friend, and Greiner responded "I'm not going under the

bus with [you.]  I'm about to retire in 2 years."  *Id.*  Plaintiff and Greiner then had a

heated exchange of words before returning to work and finishing the work shift and

leaving.[6]  *Id.*  At 1:15 A.M. on September 21, 2011, Plaintiff received a text message

from Greiner who inquired whether Plaintiff was still upset with Greiner for laughing

when their co-workers called Plaintiff names rather than defending Plaintiff, and Plaintiff

responded by text message she was still upset because Greiner had offended and

insulted her.  *Id.*  Plaintiff continued to exchange text messages with Greiner for another

20 minutes until 1:56 A.M., with Plaintiff sending 23 text messages ("the text

messages"),[7] when Plaintiff "ended the conversation after some insulting and personal

remarks."  *Id.*  Despite the poor grammar and misspellings, the text messages are

undeniably crude stating, for example: "lk to have called u the old ugly new whore so

you are and your man said it to so have a good life," "All the people at the news see u

asdumb and stupid and a piece of ass no brains so wacke up stupid even your man, "

and "at to me personally  now run tell that you tell everything im not scared to tell    uaint

nobody but the slut of the news that why."  According to Plaintiff, by then "it was clear

our friendship was over."  *Id.*

---

[6] It is implied in the record that Plaintiff and Greiner were permitted to leave work prior to the designated end of their shift.  *See* Amended Complaint ¶ 2 (alleging Plaintiff and Greiner were allowed to go home early because their work was finished).  In any event, neither Plaintiff nor Greiner asserts she was present at The News when the text messages were exchanged.  *See* Plaintiff's Dep. Tr. at 97 and 117 (stating she and Greiner were not at The News when the text messages were exchanged).
[7] Horton Affidavit Exh. E.

On September 22, 2011, a meeting was held at Plaintiff's request with Plaintiff, Gallivan, Union Executive Board member Steve Fry ("Fry"), and Union Mailroom Chairman John Fletch ("Fletch").  At the meeting, Plaintiff alleged that she had been harassed by other employees and Fletch said he would investigate.  Also on September 22, 2011, two of Plaintiff's co-workers, Kameliya and Veselin Yankova ("the Yankovas"), a married couple, filed a complaint asserting Plaintiff had taken pictures of them with Plaintiff's cell phone, which is a violation of Mailroom Rule 6.  The Yankovas expressed concern for their safety based on Plaintiff's taking their picture.  Later that same day, Greiner left a message for Gallivan complaining of the 23 text messages Greiner had received from Plaintiff on September 21, 2011.

On September 23, 2011, Gallivan met with Greiner about the text messages. Fletch was also present at the meeting during which Greiner provided Gallivan with hard copies of the text messages by downloading them from Greiner's cell phone while Johnson, and Union Chairman John Fletch ("Fletch") observed.  Greiner's cellphone did not show any texts sent from Greiner to Plaintiff.

On September 24, 2011, a meeting was held between The News and Plaintiff's co-worker Karen Wingerter ("Wingerter"), at which Fletch was also present.  Wingerter complained about a confrontation with Plaintiff on September 22, 2011, and signed a statement dated September 24, 2011, reporting Wingerter observed Plaintiff, on September 22, 2011, in the "inserter area" of the mailroom after meeting with Gallivan and the Union talking to one "Cindy Nowlin ("Nowlin").  Wingerter Statement. [8] Wingerter then mentioned to Plaintiff that Wingerter was aware Plaintiff and "Greiner are feuding but why did you have to include rumors about other people in your text

---

[8] Gallivan Affidavit Exh. C.

messages." *Id.* According to Wingerter, Plaintiff "stated that [Greiner] was a liar and started pointing her finger in [Wingerter's] face and said you can tell Karen G[reiner] that she is a dirty whore that has F'd everyone in the News and you can tell her I said that." *Id.*

Believing the text messages showed Plaintiff violated Mailroom Rule 10 and the Anti-Harassment Policy, and Plaintiff's picture of the Yankovas taken on September 22, 2011 violated Mailroom Rule 6, on September 25, 2011, Gallivan met with Plaintiff, who was represented at the meeting by Fletch, and Assistant Mailroom Manager Johnson. During the meeting, Plaintiff admitted sending Greiner the text messages and also asserted she had copies of text messages Plaintiff maintains Greiner sent her and to which Plaintiff's text messages were in response, implying the tone of Plaintiff's text messages matched that of Greiner's text messages. Gallivan then scheduled a further meeting for September 27, 2011, at which Plaintiff was to provide copies of the text messages she maintains Greiner sent her, as well as any other evidence rebutting Greiner's complaint against Plaintiff to permit Gallivan to determine the appropriate discipline to be imposed for Plaintiff's violation of Mailroom Rules 6 and 10 and the Anti-Harassment Policy. Plaintiff left the meeting in tears, accompanied by Fletch who assured Plaintiff the Union would investigate the charges against Plaintiff.

On the morning of September 26, 2011, Gallivan telephoned and informed Plaintiff not to report to work her next scheduled shift on September 27, 2011, but that Plaintiff would be paid for the shift. A few minutes later, Fletch contacted Plaintiff to inform Plaintiff Fletch wish to meet with her to prepare for a meeting scheduled for September 27, 2011. Plaintiff then called an attorney and explained in detail the

circumstances under which Gallivan had scheduled to meet with Plaintiff on September 26, 2011.  The attorney with whom Plaintiff spoke advised that the purpose of the meeting may be to terminate Plaintiff's employment.  Plaintiff was so disturbed to hear her employment may be terminated that she scheduled a meeting for October 6, 2011, with an Equal Employment Opportunity Commission ("EEOC") attorney.  Plaintiff, then feeling depressed and stressed, contacted her physician, Richard Carlson, M.D. ("Dr. Carlson"), who instructed Plaintiff to go to Erie County Medical Center ("ECMC"), where Dr. Carlson admitted Plaintiff for evaluation.  Plaintiff never met with Fletch, and the September 27, 2011 meeting never occurred because Plaintiff left work on sick leave per Dr. Carlson's orders.  On the morning of September 27, 2011, The News was informed by Plaintiff that she was taking an extended disability leave and would not return to work under January 9, 2012.

On October 6, 2011, Plaintiff filed with the New York State Division of Human Rights ("SDHR"), a complaint complaining of race-based employment discrimination ("SDHR Complaint").[9]  The News received a copy of the SDHR Complaint on October 10, 2011.  Bayerl investigated the claims asserted in the SDHR Complaint to which Bayerl responded on October 25, 2011, with a position letter.

On January 6, 2012, Fletch telephoned Plaintiff and advised everything was in order for Plaintiff's anticipated return to work, but that Gallivan had arranged for the disciplinary meeting that was supposed to have taken place on September 27, 2011, to occur on January 9, 2012.  Fletch wanted to meet with Plaintiff prior to Plaintiff meeting with Gallivan.  Fletch met with Plaintiff on January 9, 2012 prior to the scheduled meeting with Gallivan.  At the preparatory meeting, Fletch and Plaintiff discussed the

---

[9] Bayerl Affidavit Exh. A.

evidence The News had pertaining to the charged violations of Mailroom Rules 6 and 10, and the Anti-Harassment Policy, as well as the evidence supporting Plaintiff's version of the events.

The January 9, 2012 disciplinary meeting was attended by Plaintiff, Gallivan, Union President Joe Cannizzaro ("Cannizzaro"), Fletch, and Johnson.  Plaintiff, when shown the text messages Greiner received on September 21, 2011, did not deny sending them.  Plaintiff, however, did not produce the text messages from Greiner, and indicated she would not and could not do so.  Based on Plaintiff's failure to provide any evidence justifying or mitigating the severity of the text messages, as well as Plaintiff's admission that she sent the inappropriate and harassing text messages, Gallivan terminated Plaintiff's employment with The New at the end of the January 9, 2012 meeting.

After the January 9, 2012 meeting concluded, Fletch reviewed the evidence and arguments presented by The News, as well as Fletch's own investigation and determined that Plaintiff's text messages to Greiner were indefensible under the Anti-Harassment Policy, and that Plaintiff's conduct in sending the text messages was neither provoked or in any way justified.  Fletch also considered the testimony by other employees of The News and concluded that any grievance pursued by the Union would be fruitless because the termination of Plaintiff's employment would only be upheld. Fletch then recommended to Cannizzaro that the Union not file any grievance regarding The News' termination of Plaintiff's employment.  Fletch and Cannizzaro also discussed Fletch's recommendation with the Union's Printing Sector President Daniel Wasser

("Wasser"), who concurred with the decision not to pursue any grievance.  Fletch then contacted Plaintiff and advised her of the Union's decision not to file a grievance.

On January 19, 2012, after learning the Union would not pursue a grievance challenging The News' termination of her employment, Plaintiff filed an unfair labor practice charge with the National Labor Relations Board ("NLRB") ("the unfair labor practice charge"), alleging the Union breached its duty of fair representation.  The NLRB's investigation of the unfair labor practice charge included a meeting between Plaintiff and an NLRB agent.  Based on the investigation, the NLRB Region 3 Regional Director ("NLRB Regional Director") concluded no further proceedings were warranted and dismissed Plaintiff's unfair labor practice charge.  Plaintiff appealed the NLRB Regional Director's decision to the NLRB's Office of General Counsel which, on March 30, 2012, sustained the NLRB Regional Director's determination.

On April 2, 2012, the SDHR issued its Determination and Order After Investigation ("SDHR Determination"),[10] finding no probable cause to believe Plaintiff had been discriminated against by The News and dismissing the SDHR Complaint.

Plaintiff then commenced the instant action on October 18, 2012.


## DISCUSSION

### 1.    Summary Judgment

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[10] Bayerl Affidavit Exh. A.

242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes*

*Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).   "[F]actual issues created

solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine'

issues for trial."   *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir.

1996).

In accordance with the Supreme Court's direction that pleadings and papers be

liberally construed, *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (allegations of *pro se*

litigant's complaint are held to "less stringent standards than formal pleadings drafted by

lawyers"); *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) (*pro se* litigants are

afforded "special solicitude" including liberal construction of their pleadings and papers

(citing cases)), a liberal construction of the allegations asserted in Plaintiff's rather

disjointed and rambling Amended Complaint and the papers filed in response to the

pending summary judgment Motions establishes Plaintiff is challenging the termination

of her almost 20-year employment with The News as well as the Union's failure to

grieve the termination.  Plaintiff maintains that the termination of her employment for

sending inappropriate and harassing text messages to Greiner, who is white, was

unlawful because the exchange of the text messages did not occur at work, and Greiner

instigated the exchange of the subject text messages, yet Greiner was not subjected to

any discipline, but remained employed with The News from which Greiner has since

retired.  Plaintiff's claims seek damages for the alleged unlawful termination of her

employment by The News, which she maintains was in violation of Title VII and the

CBA, and the Union's failure to investigate the termination, thereby breaching its duty of

fair representation.[11]  Defendants seek summary judgment on all three claims arguing

---

[11] Although the Amended Complaint may be broadly construed as asserting additional claims, the court's
review is limited to those claims Plaintiff was permitted by the July 17, 2013 D&O to replead.

Plaintiff is unable to establish any unlawful conduct by either The News or the Union in terminating Plaintiff's employment.

Preliminarily, the court addresses the same assertion by The News and the Union that Plaintiff's failure to submit a counter statement to The News' and the Union's Statement of Facts requires each of the facts therein asserted by deemed admitted. The New's Reply at 2-2 (citing Local Rules of Civil Procedure – W.D.N.Y., Rule 56(a)(2)); Union's Reply at 2-3 (same).  As relevant, Fed.R.Civ.P. 83 provides that a "local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply."  Fed.R.Civ.P. 83(a)(2). *See Buck v. Cleary*, 345 Fed.Appx. 660, 662 (2d. Cir. Sept. 14, 2009) (finding district court abused discretion in deeming admitted defendants' statement of material facts based on *pro se* plaintiffs' failure to separately respond to each stated fact as required under the applicable local rule, vacating in the absence of any evidence that the failure to comply was willful, and remanding that portion of judgment based on such deemed admitted facts).  Similarly, in the instant case, nothing in the record establishes that Plaintiff's failure to formally comply with Local Rule 56 was willful.  Accordingly, the court, in the exercise of its discretion, does not deem admitted the facts set forth in either The News' or the Union's Statement of Facts.

**2.     Employment Discrimination**

Plaintiff claims The News terminated her employment because she is African-American.  The News argues in support of summary judgment on this claim that Plaintiff cannot establish a *prima facie* case of employment discrimination because there is no evidence the termination of Plaintiff's employment was based on her race, The News'

Memorandum at 9-12, nor can Plaintiff establish a *prima facie* case of retaliation.  *Id.* at

12-16.  According to The News, Plaintiff's employment was terminated for legitimate

reasons, *id.* at 16-17, which Plaintiff is unable to show are pretextual.  *Id.* at 17-19.  The

News further argues that Plaintiff has not asserted any facts establishing a hostile work

environment claim.  *Id.* at 21-15.  Plaintiff's opposition to summary judgment primarily

consists of the transcripts of the various depositions conducted in connection with this

litigation, a copy of the CBA, copies of the text messages, copies of a log from Plaintiff's

cell phone service provider, T Mobile, establishing that text messages were exchanged

between Plaintiff's and Greiner's cell phones as alleged, a copy of a birthday card

Greiner gave Plaintiff on September 18, 2011, a copy of Plaintiff's EEOC complaints

filed against The News and the Union, copies of paychecks from The News, copies of

some of Plaintiff's medical records dated September 27, 2011, and exhibits pertaining to

an earlier grievance Plaintiff filed with The News in 2005.  In further support of summary

judgment, The News asserts Plaintiff's failure to submit a response to The News'

Statement of Facts requires the court deem admitted each fact asserted therein, The

News' Reply at 2-3, Plaintiff's failure to submit any evidence supporting any of her

claims requires summary judgment, *id.* at 3-4, and Plaintiff has failed to point to any

issue of fact calling into question The News' assertion that Plaintiff's employment was

terminated because Plaintiff violated workplace rules and The News' Anti-Harassment

Policy.  *Id.* at 5-7.

Given the imprecise nature of the claims asserted in the Amended Complaint, the

court construes the Amended Complaint as asserting under Title VII claims for disparate

treatment, retaliation, and hostile work environment.

16

### A.    Title VII – Disparate Treatment

Plaintiff's Title VII disparate treatment claim is analyzed pursuant to a burden-shifting test established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) ("*McDonnell Douglas*").  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (discrimination claims under, *inter alia*, Title VII).  Upon meeting this *de minimus* burden of establishing a *prima facie* case of employment discrimination, *Brennan v. Metropolitan Opera Association, Inc.*, 192 F.3d 310, 316-17 (2d Cir. 1999) (citing *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)), the burden shifts to Defendant to offer a legitimate, non-discriminatory reason for the challenged actions. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Once Defendant has asserted a neutral reason for the alleged discriminatory action, "the inference of discrimination raised by the prima facie case then drops out and the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason is merely a pretext for discrimination." *Brennan*, 192 F.3d at 317 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993)).  *See also Terry*, 336 F.3d at 138 ("'to defeat summary judgment, the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" (citing *Stern v. Trustees of Columbia*,131 F.3d 305, 312 (2d Cir. 1997))).

### A.  *Prima Facie* Case

As stated, in the instant case, Plaintiff alleges The News discriminated against Plaintiff because of race in violation of Title VII.  To establish a *prima facie* case of

employment discrimination based on disparate treatment in violation of Title VII, Plaintiff

must demonstrate (1) she belonged to a protected class; (2) she was qualified for the

position she held; (3) she was subjected to an adverse employment action; and (4) the

adverse action occurred under circumstances giving rise to an inference of

discrimination.  *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (citing *Ruiz v.*

*County of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010)).  The classes protected

under Title VII include race, color, religion, sex, and national origin.  42 U.S.C. § 2000e-

2(a)(2).  Here, that Plaintiff, as an African American, belongs to the protected class of

race establishes the first element of his disparate treatment claim, a fact The News

does not dispute.  Nor does The News dispute that Plaintiff was qualified for her position

in The News' mailroom or that the termination of Plaintiff's employment was an adverse

employment action.  Nevertheless, Defendants dispute the remaining element of a

disparate treatment claim, *i.e.*, that Plaintiff's termination occurred under circumstances

giving rise to an inference of discrimination.  The News' Memorandum at 10-11

asserting that Plaintiff, by sending a series of inappropriate and harassing text

messages to Greiner, violated Mailroom Rules and The News' Anti-Harassment Policy

for which Plaintiff's employment was terminated.  Plaintiff's response, as discussed

above, Discussion, *supra*, at 16, is completely bereft of any evidence which any

reasonable jury could construe as giving rise to an inference that that the circumstances

under which Plaintiff was terminated were discriminatory based on Plaintiff's race.

     In the absence of any direct evidence of employment discrimination based on

disparate treatment, to establish the fourth prong of a *prima facie* case of disparate

treatment, *i.e.*, a causal relationship between the plaintiff's membership in a protected

class and the adverse employment action, the plaintiff must show the adverse

employment action occurred under circumstances giving rise to an inference of

discrimination which is generally accomplished by "showing that the employer treated

plaintiff 'less favorably than a similarly situated employee outside the protected group.'"

*Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).  "A plaintiff relying on

disparate treatment evidence 'must show she was similarly situated in all material

respects to the individuals with whom she seeks to compare herself.'"  *Id.* (quoting

*Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).  Although whether two

employees are similarly situated generally presents a question of fact for the jury,

*Graham*, 230 F.3d at 39 (citing cases), "[t]his rule is not absolute, [ ], and a court can

properly grant summary judgment where it is clear that no reasonable jury could find the

similarly situated prong met."  *Harlen Associates v. Incorporated Village of Mineola*, 273

F.3d 494, 499 n. 2 (2d Cir. 2001) (citing *Cruz v. Coach Stores*, 202 F.3d 560, 568 (2d

Cir. 2000)).  "In this analysis, there must be an 'objectively identifiable basis for

comparability' between the plaintiff and the comparator employee, which includes an

assessment of 'whether the conduct for which the employer imposed discipline was of

comparable seriousness.'"  *Zuk v. Onondaga County*, 471 Fed.Appx. 70, 71 (2d Cir.

June 18, 2012) (quoting *Graham*, 230 F.3d at 40).

　　　In the instant case, Plaintiff fails to identify any other employee by name or race

who has been accused of violating Mailroom Rule 10, but not subjected to discipline.

As such, it is not possible to determine from record whether The News' terminating

Plaintiff's employment for violating Mailroom Rules and The News' Anti-Harassment

Policy was disproportionate to African-American employees as compared to non-

African-American employees.  Accordingly, the fourth element, and thus a *prima facie* case, for a claim of race-based disparate treatment employment discrimination is not established.  Because Plaintiff has failed to establish a *prima facie* case of disparate treatment based on race, the burden does not shift to Defendants to offer a legitimate, non-discriminatory reason for the challenged actions.  The News' Motion seeking summary judgment on Plaintiff's disparate treatment based on race claim under Title VII should be GRANTED.

### B.  Legitimate, Non-Discriminatory Reasons

Should the District Judge disagree with the undersigned's finding that Plaintiff has failed to establish a *prima facie* case of employment discrimination, the court addresses whether The News has articulated a legitimate, non-discriminatory reason for the asserted adverse employment action, *i.e.*, terminating Plaintiff's employment.  The News maintains that Plaintiff's sending the text messages violated Mailroom Rule 10 and The News' Anti-Harassment Policy.  The News' Memorandum at 10-11. Significantly, Plaintiff does not deny either sending the text messages, or that the text messages do violate Mailroom Rule 10 and the Anti-Harassment Policy.[12]  Accordingly, The News has demonstrated a legitimate, non-discriminatory reason for the termination of Plaintiff's employment, thereby shifting the burden back to Plaintiff to establish such reason was mere pretext to unlawful race-based employment discrimination.

---

[12]  Although Plaintiff alludes to the fact that the communications upon which her termination was based occurred other than at the workplace, Plaintiff does not argue with The News' interpretation that the Mailroom Work Rules and Anti-Harassment Policy remain applicable as Plaintiff's conduct was the result of her workplace encounter with Greiner and that such interpretation was disparately applied to Plaintiff in this case because of Plaintiff's race.

### C.      Pretext to Discrimination

Where the defendant articulates a nondiscriminatory reason for its challenged

actions, "the presumption of discrimination is rebutted and it 'simply drops out of the

picture.'"  *Connell v. Consolidated Edison Co. of New York, Inc.*, 109 F.Supp.2d 202,

207 (S.D.N.Y. 2000) (quoting *St. Mary's Honor Center*, 509 U.S. at 510-11).  Then the

plaintiff must show, "without the benefit of any presumptions, that more likely than not

the employer's decision was motivated at least in part by a discriminatory reason."  *Id*.

(citing *Grady v. Affiliated Center, Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).  Plaintiff may

do this by relying on the evidence already presented to establish a *prima facie* case, as

well as any additional evidence.  *Id*.  Further, "because the fourth prong of the prima

facie case in this context is proof of circumstances giving rise to an inference of

discrimination, as a practical matter, there is little difference between the evidence that

a plaintiff would present in proving just the prima facie case and pretext in proving the

'ultimate fact of discrimination.'"  *Id*. at 208 n. 5.

In the instant case, Plaintiff maintains in opposition to summary judgment the text

messages she sent were in response to text messages received from Greiner, in which

Greiner made equally disparaging and vulgar remarks toward Plaintiff, yet Plaintiff

refused Gallivan's request to provide Greiner's text messages, insisting they were

"irrelevant" and "private."   Plaintiff's Dep. Tr.[13] at 95-97.  *See also id*. at 177 (Plaintiff

stating she did not feel like she had to preserve Greiner's text messages or show them

to Gallivan and Fletch because Plaintiff believed the text message log from T Mobile[14]

---

[13] References to "Plaintiff's Dep. Tr." are to the pages of the transcript of Plaintiff's deposition, portions of which are filed as Horton Affidavit Exh. A, and as Union's Depositions at 3-93.

[14] A copy of Plaintiff's cell phone's text message log from T Mobile relative to the time in question, Union's Deposition Exhibits Pt. 1 at 79-81, shows that each of the 23 text messages were sent in response to an

(Plaintiff's cell phone carrier) established that Greiner began the text message thread by texting Plaintiff first).  Plaintiff later asserts that she erased the messages from Greiner as she received them, maintaining she was unfamiliar with the proper operation of her cell phone which she had owned since January 2011.  *Id*. at 81, 101.  Plaintiff does not deny sending the text messages to Greiner, but maintains that because she was not at work when the text messages were sent, Plaintiff never should have been disciplined for sending the text messages.  *Id*. at 117.  Plaintiff further stated she directed the remarks to Greiner "out of anger" and that she "did it at home.  I didn't harass her at work."  *Id*. at 186.  *See also id*. at 83 ("It wasn't at work and she texted me first.").  Plaintiff maintains she never would have harassed Wingerter because Wingerter is Plaintiff's friend Greiner's son's "baby momma."  Amended Complaint ¶ 7.  Plaintiff also denies taking pictures of the Yankovas, describing them as a "nice couple" who Plaintiff trained.  *Id*.

Although not addressed by either party, Plaintiff's failure to present evidence necessary to establish that the termination of her employment occurred under circumstances giving rise to an inference of discrimination also dooms any attempt to establish that The News' articulated legitimate, non-discriminatory reasons were mere pretext to discrimination.  Despite Plaintiff's assertion that the text messages were not exchanged at work but, rather, were exchanged after work, Mailroom Rule 10 is not, by its terms, limited to conduct occurring only at The News or in the mailroom.  Furthermore, the context of the text messages undeniably establishes that they pertain to the workplace and were a continuation of a dispute that arose during work.  For example, Plaintiff maintains that Greiner initiated the exchange of the text messages by

incoming text message from the same cell phone number to which Plaintiff sent the text messages, strongly implying Plaintiff's assertion that each of the 23 text messages was sent in response to a text message received from Greiner.

sending the first text message inquiring whether Plaintiff was still upset with Greiner for failing to defend Plaintiff at lunch the previous evening.  Amended Complaint ¶ 2.  Also, Plaintiff does not dispute that the text messages were a continuation of a confrontation between Plaintiff and Greiner that commenced during their scheduled work shift.  That the text messages were based on work is further demonstrated by Plaintiff's deposition testimony that she called Greiner a whore because Greiner "went out with five guys at the job and she lived with three of them."  Plaintiff's Dep. Tr. at 96.  Significantly, as discussed, Discussion, *supra*, at 20, Plaintiff does not deny sending the text messages nor that their content was crass.  Even if the applicability of the Mailroom Rules and Anti-Harassment Policy to Plaintiff's course of conduct presented a question of fact for trial, the absence of any evidence that The News' application of such rules to Plaintiff's conduct was racially motivated demonstrates The News' action in discharging Plaintiff was non-pretextual, thus requiring dismissal of Plaintiff's Title VII claim.  Significantly, the court is not required to scour the record for evidence supporting Plaintiff's argument. *See Taylor v. Harbour Point Homeowners' Association*, 690 F.3d 44, 48 (2d Cir. 2012) (the court is not permitted to "scour the record" to research legal theories and to serve as an advocate for one party over the other).

Accordingly, summary judgment should be GRANTED in favor of The News on Plaintiff's race-based disparate treatment claim under Title VII.

### B.      Title VII – Retaliation

Plaintiff's Title VII claim alleging retaliation asserted against The News is analyzed pursuant to the same *McDonnell Douglas* burden-shifting test applied to Plaintiff's disparate treatment claim.  *Kirkland v. Cablevision Systems*, 760 F.3d 223,

225 (2d Cir. 2014) ("[the plaintiff's] Title VII race discrimination and retaliation claims are subject to the *McDonnell Douglas* burden-shifting analysis.").  In particular, "[t]o state a prima facie case of retaliation under Title VII, a plaintiff must proffer evidence that he engaged in a protected activity, such as complaining about race discrimination, and that his employer took an adverse action in retaliation."  *Id.* (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)).  Upon meeting this *de minimus* burden of establishing a *prima facie* case of retaliation, "a presumption of retaliation arises," shifting the burden to the defendants to "articulate a legitimate, non-retaliatory reason for the adverse employment action."  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).  Once Defendants have asserted a neutral reason for the alleged discriminatory action, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action."  *Id.*

### 1. *Prima Face* Case

"'To make out a prima facie case of retaliation, an employee must show that the employee was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the protected activity and the adverse employment action.'"  *Collins v. New York City Transit Authority*, 305 F.3d 113, 118 (2d Cir. 2002) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)).  Activity that is protected against retaliation includes not only formal complaints filed with an agency such as the EEOC, or commencing a lawsuit, but also internal complaints made to management.  *Raniola v. Bratton*, 243 F.3d 610, 624-25 (2d Cir. 2001) (citing cases).  Further, "in order to recover for retaliation for having filed such

a complaint, the plaintiff need not prove that her underlying complaint of discrimination had merit." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012) (citing cases).

In the instant case, with regard to the first element, Plaintiff's filing of the SDHR Complaint on October 6, 2011, constitutes protected activity, and The News does not argue otherwise.  It is also undisputed that The News was aware that Plaintiff had engaged in Title VII protected activity, as required for the second element of a retaliation claim, given Bayerl's statement that as The News' Vice President of Human Resources and General Counsel, he investigated and prepared The News' response to the SDHR Complaint.  It is also undisputed that the termination of Plaintiff's employment constitutes an adverse employment action satisfying the *prima facie* retaliation claim's third element.  *Galabaya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (considering termination of employment to be an adverse employment action).  As to the fourth element, *i.e.*, a causal connection between Plaintiff's filing of the SDHR Complaint and the termination of Plaintiff's employment, the "[c]lose temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action."  *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  Although the three month gap between Plaintiff's filing of the SDHR Complaint on October 6, 2011, and the termination of her employment on January 9, 2012, has been held to be sufficiently close to establish the causal connection, *see Gorzynski*, 596 F.3d at 110 (one-month gap between protected activity and adverse employment action supports an inference of discrimination (citing *Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001)

(holding five-month gap is not too long to find causal relationship)), that Plaintiff did not

file the SDHR Complaint until after Plaintiff learned The News was considering

terminating Plaintiff's employment as discipline for her violation of Mailroom Rule 10,

strongly cuts against such finding.  Because, however, the record is thus devoid of any

evidence establishing The News had definitely decided, as of October 6, 2011, to

terminate Plaintiff's employment, whether the termination decision was causally related

to Plaintiff's filing of the SDHR Complaint remains a disputed issue of fact.  As such, an

issue of fact exists as to whether Plaintiff can establish the fourth element of a *prima*

*facie* case of retaliation in violation of Title VII, and the burden shifts to Defendants to

provide a legitimate, non-retaliatory reason for such adverse employment actions.

### 2.  Legitimate, Non-Discriminatory Reasons

At the summary judgment stage, if the plaintiff presents at least a minimal

amount of evidence to support the elements of the *prima facie* retaliation claim, the

burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason

for the adverse employment action."  *Kaytor*, 609 F.3d at 552-53.  In the instant case,

The News asserts that the termination of Plaintiff's employment was based on her

violation of Mailroom Rule 10, *i.e.*, the sending of multiple harassing text messages to

Greiner.  The News thus has asserted a legitimate, non-discriminatory reason for the

adverse employment action.  Accordingly, the burden is shifted back to Plaintiff to

demonstrate issues of fact that may indicate such reason is mere pretext to retaliation.

### 3.  Pretext to Retaliation

If the defendant employer produces evidence supporting a legitimate non-

discriminatory reason for the adverse employment action, the employee, to avoid

summary judgment, "must show that retaliation was a substantial reason for the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).  This burden can be satisfied by proof that "'a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment actions].'"  *Id.* at 164-65 (bracketed material in original; quoting *Sumner v. U.S. Postal Serv.*, 899 F.3d 203, 209 (2d Cir. 1990)).  Here, the evidence fails to establish issues of fact as to whether The News's proffered reason for terminating Plaintiff's employment was indeed legitimate and non-retaliatory.

In particular, in opposition to summary judgment, Plaintiff offers nothing disputing the legitimate and non-retaliatory nature for The News' proffered reasons for terminating Plaintiff's employment; rather, Plaintiff asserts only excuses for her conduct, the seriousness of which Plaintiff refuses to acknowledge.  Significantly, although Plaintiff maintains she sent the text messages in response to text messages from Greiner that were of a similar nature, Plaintiff, despite being given more than one opportunity to produce Greiner's text messages for comparison to Plaintiff's text messages with the express purpose of determining whether the language of Greiner's messages warranted any mitigation of the resulting discipline, failed to provide Greiner's messages.  Plaintiff, by failing to offer anything in opposition has thus conceded that she engaged in such behavior.  *See Ceglia v. Zuckerberg*, 2013 WL 1208558, at * 20 (W.D.N.Y. Mar. 26, 2013) (citing cases), *report and recommendation adopted by* 2014 WL 1224574 (W.D.N.Y. Mar. 25, 2014), *aff'd*, 600 Fed Appx. 34 (2d Cir. Apr. 20, 2015), *cert. denied*, __ U.S. __; 136 S.Ct. 823 (2016).  Further, Plaintiff gave deposition testimony

describing Greiner's text messages to which Plaintiff maintains her text messages responded as "irrelevant," Plaintiff's Dep. Tr. at 97, rendering it impossible that The News' response to such behavior was a mere pretext for retaliation.

Accordingly, The News' motion for summary judgment should be GRANTED as to Plaintiff's retaliation claim.

### C. Title VII – Hostile Work Environment

Insofar as Plaintiff's Amended Complaint can be construed as asserting a hostile work environment based on her race, such claim also fails for want of any supporting evidence. The criteria for establishing a hostile work environment claim, which does not employ the *McDonnell Douglas* burden shifting analysis, are different than those for a disparate treatment claim, which does. *See Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (recognizing distinction between *McDonnell Douglas* burden-shifting framework and hostile work environment analysis). *See also Nichols v. Volunteers of America, North Alabama, Inc.*, 470 Fed.Appx. 757, 766 & n. 1 (11th Cir. Apr. 18, 2012) (citing cases comparing elements of hostile work environment claim with discrimination elements and retaliation elements under *McDonnell Douglas*). Specifically, to establish a hostile work environment claim under Title VII, "'a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Rivera v. Rochester Genesee Regional Transportation Authority*, 743 F.3d 11, 20 (2d Cir. 2012) (quoting *Gorzynski*, 596 F.3d at 102 (further internal quotation omitted)). "In considering whether a plaintiff has met this burden, courts should 'examin[e] the totality of the circumstances,

including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance.'" *Id.* (quoting *Hayut v. State University of New York*, 352 F.3d 733, 745 (2d Cir. 2003)).  "Moreover, the 'test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'" *Id.* (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).  "Of course, '[i]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through [other means], is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic,' such as race or national origin." *Id.* (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic." (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79-80 (1998)))).

In the instant case, the only evidence to which Plaintiff points in support of a hostile work environment claim is her assertion that on one occasion, a delivery label read "Niagar," which Plaintiff complained to Gallivan was intended as a racial slur. Gallivan Affidavit ¶ 28.  Gallivan explained to Plaintiff "the label was simply a slight misspelling of the word 'Niagara,' which is where the delivery was headed," and Plaintiff did not further pursue the matter.  *Id.*  Even assuming, arguendo, the misspelled label

was intended as a racial slur, such fact alone is insufficient to establish a hostile work environment claim.  *See*, *e.g.*, *Carter v. New Venture Gear, Inc.*, 310 Fed.App'x 454, 458 (2d Cir. 2009) (note to African-American employee stating "get out we do not want you here" too infrequent and insufficient to create hostile work environment); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993) ("mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII.");  *Schwapp v. Town of Avon*, 118 F.3d 106, 110-11 (2d Cir. 1997) (holding "for racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments" (internal quotation marks and citations omitted)).  Other than the undisputed fact that Plaintiff is an African-American, the Complaint and the record are devoid of any indication of any incidents of hostility to which Plaintiff was subjected was based on Plaintiff's race or gender.  For example, Plaintiff does not allege any asserted mistreatment accompanied by racial slurs or any other action indicating Defendants were hostile toward Plaintiff based on her race.  Indeed, Plaintiff alleges no attributions to her race were made by Gallivan, Fletch, Johnson, or Cannizzaro.  *See Frederick v. United Brotherhood of Carpenters and Joiners of America (UBCJA) Local 926*, 2014 WL 5783045, at * 5 (E.D.N.Y. Nov. 6, 2014) (granting defendants' motion to dismiss hostile work environment claim for failure to state a claim where plaintiff offered no allegation of mistreatment related to her race).  Nor does anything in the record, other than the mere fact that Plaintiff is African-American establish that the conduct of which Plaintiff complains was taken against her based on

her race.  *See Cummings-Fowler v. Suffolk County Community College*, 981 F.Supp.2d

124, 137-38  (E.D.N.Y. 2013) (granting summary judgment on hostile work environment

claim where none of the alleged abhorrent or inflammatory comments involved

"egregious language, slurs, or epithets."), *aff'd*, 588 Fed.Appx. 32 (2d Cir. Dec. 16,

2014).  *Compare Turley v. ISG Lackawwana, Inc.*, 803 F.Supp.2d 217, 249-50

(W.D.N.Y. 2011) (evidence that defendants knew about yet failed to remedy conduct in

which plaintiff was confronted with race-related graffiti and death threats sufficient to

avoid summary judgment on hostile work environment claim).

Accordingly, The News' motion for summary judgment should be GRANTED as

to the hostile work environment claim.

### 3.        Unfair Labor Practice

Plaintiff alleges that The News and the Union violated the CBA with regard to the

termination of Plaintiff's employment on January 9, 2012.  Amended Complaint ¶ 1.  In

support of summary judgment, both The News and the Union have construed this claim

as a hybrid breach of contract/duty of fair representation claim under § 301 of the Labor

Management Relations Act, 29 U.S.C. § 185, governing an employer's obligation to

comply with a union contract or CBA and the union's duty of fair representation. The

News' Memorandum at 19 (citing *Vaca v. Sipes*, 386 U.S. 171 (1967)); Union's

Memorandum at 8-17.  The News argues in support of summary judgment that Plaintiff

cannot establish any violation of the CBA and, as such, is unable to establish her unfair

labor practice claim.  The News' Memorandum at 19-21.  Plaintiff has failed to assert

any relevant argument in opposition to summary judgment on this claim, a fact on which

The News and the Union rely in further support of summary judgment, The News' Reply

at 3-5; Union's Reply at 2-5, as well as Plaintiff's failure to point to any evidence

establishing such claim.  The News' Reply at 5-7; Union's Reply at 5-7.

"[T]o provide individual employees with recourse when a union breaches its duty

of fair representation in a grievance or arbitration proceeding, the Supreme Court has

held that an employee may bring suit against both the union and the employer."  *Carrion*

*v. Enterprise Ass'n, Metal Trades Branch Local Union 638*, 227 F.3d 29, 33 (2d Cir.

2000) (citing *DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 164 (1983)).

Such a suit necessarily alleges the employer breached the CBA while the union

breached its duty of fair representation, and "is known as a hybrid § 301/fair

representation claim."  *Id.* (citing DelCostello at 164-65).  In such a hybrid § 301/fair

representation claim, the employee may sue the employer, the union, or both, and to

prevail, the employee must show not only that her discharge was contrary to the CBA,

but also that the union breached its duty of fair representation required by the CBA and

§ 301.  *Id.*  In the instant case, Plaintiff cannot establish either that in terminating her

employment, The News violated the CBA or that the Union breached its duty of fair

representation.

### A.    Breach of the CBA

The News argues in support of summary judgment that insofar as Plaintiff alleges

a breach of the CBA, should the court determine there exists a question of fact as to

whether the Union breached its duty of fair representation, the undisputed evidence in

the record establishes that Plaintiff admitted violating the Mailroom Rules and Anti-

Harassment Policy by sending to Greiner the text messages containing profane and

harassing language.  The News' Memorandum at 20-21.  Plaintiff has not responded in

opposition to The News' motion for summary judgment on this claim.

As relevant, the CBA provides that The News

shall effectuate a system of progressive discipline, for cause, which follows the steps of an oral warning, written warning, an unpaid suspension of up to two weeks and discharge.  Depending upon the seriousness of the conduct in question, [The News] may skip any or all of the steps.

CBA, Art. 9, § 1.

The CBA further provides that The News "may discharge [an employee] . . . for violation

of office rules. . . ."  CBA, Art. 8 § 1.

Here, not only does Plaintiff admit sending Greiner the text messages, Plaintiff

has also repeatedly failed to present any evidence supporting her assertion that the

tone of the text messages was no worse than Greiner's text messages to which Plaintiff

was responding; rather, Plaintiff maintains she deleted Greiner's text messages

because they were "irrelevant."  Plaintiff's Dep. Tr. at 97.  Plaintiff also admits she was

aware of both the Mailroom Rules and the Anti-Harassment Policy from the time she

was first hired by The News.  Plaintiff's Dep. Tr.[15] at 38-39.  There is thus no evidence

mitigating the seriousness of Plaintiff's conduct in sending the text messages that

clearly violated both Mailroom Rule 10 and the Anti-Harassment Policy.

Accordingly, there is no evidence in the record establishing that The News'

terminated Plaintiff's employment in violation of the CBA, and Plaintiff thus cannot

establish the first prong of her unfair labor practice claim.

---

[15] References to "Plaintiff's Dep. Tr." are to the page of the transcript of Plaintiff's deposition, portions of which are filed as Horton Affidavit Exh. A.

### B.    Breach of Fair Representation Duty

Plaintiff alleges that the Union breached its duty of fair representation by failing to pursue a grievance over The News' termination of Plaintiff's employment.  In support of summary judgment on this claim, the Union argues that its decision not to pursue a grievance over The News' termination of Plaintiff's employment was not a breach of the Union's duty of fair representation.  Union's Memorandum at 8-17.  In particular, the Union maintains that its decision not to file any grievance was not arbitrary, *id.* at 11-13, discriminatory, *id.* at 13-17, nor in bad faith, *id.* at 17-18.  Plaintiff's papers filed in opposition to summary judgment do not address the Union's argument.

"A union 'has a duty to represent fairly all employees subject to the collective bargaining agreement.'"  *Vaughn v. Air Line Pilots Association, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (quoting *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998)).  Plaintiff's claim that the Union breached its duty of fair representation requires Plaintiff establish that the Union's decision not to pursue a grievance regarding the termination of Plaintiff's employment was "arbitrary, discriminatory or in bad faith." *Vaca*, 386 U.S. at 190 ("A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith.").  Nevertheless, an employee does not have "an absolute right to have his grievance taken to arbitration regardless of the applicable collective bargaining agreement."  *Id.*  at 191.  The court's review of an alleged union violation of the duty of fair representation "is 'highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities.'"  *Vaughn*, 604 F.3d at 709 (quoting *Air Line Pilots Ass'n v. O'Neill*, 499

U.S. 65, 67 (1991)).  To be "arbitrary," a union's actions must, "in light of the factual and legal landscape at the time of the union's actions, . . . [be] so far outside a wide range of reasonableness as to be irrational."  *Id.*  Significantly, "tactical errors" and negligence by the union are insufficient to establish a breach of the duty of fair representation.  *Id.*  For a union's acts to be considered discriminatory, there must be "substantial evidence" indicating the union "engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives.'"  *Id.* (quoting *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 301 (1971)).  Further, "[b]ad faith, which 'encompasses fraud, dishonesty, and other intentionally misleading conduct,' requires proof that the union acted with 'an improper intent, purpose, or motive.'"  *Id.* at 709-10 (quoting *Spellacy*, 156 F.3d at 126).   In the instant case, the record is completely devoid of any evidence establishing an issue of fact as to whether the Union's decision not to pursue a grievance challenging The News' termination of Plaintiff's employment was arbitrary, discriminatory, or in bad faith.

Specifically, the Union has submitted evidence establishing that the Union provided Plaintiff with representation at every meeting involving Plaintiff and Gallivan following Greiner's complaint on September 22, 2011 about the text messages.  In particular, Fletch was present at the September 23, 2011 meeting where Greiner showed Gallivan the text messages and while the text messages were downloaded from Greiner's cell phone and printed on paper.  Fletch was present at the September 24, 2011 meeting between The News and Wingerter when Wingerter reported she confronted Plaintiff on September 22, 2011 about Plaintiff's including references to Wingerter in the text messages sent to Greiner, to which Plaintiff responded by calling

Greiner a 'liar" and making an obscene statement about Greiner.  When Gallivan met

with Plaintiff on September 25, 2011, to discuss Plaintiff's possible violation of

Mailroom Rules 6 and 10 and the Anti-Harassment Policy, Plaintiff was represented by

Fletch who reassured Plaintiff the Union would investigate the claimed Mailroom Rule

and Anti-Harassment Policy violations before the September 27, 2011 meeting.  On the

morning of September 26, 2011, after Gallivan told Plaintiff not to report for her work

shift on September 27, 2011, Fletch contacted Plaintiff to inform Plaintiff Fletch wish to

meet with her to prepare for a meeting scheduled for September 27, 2011.  When

Plaintiff was preparing to return to work following her medical leave, Fletch, on

January 6, 2012, telephoned Plaintiff and advised everything was in order for Plaintiff's

anticipated return to work and asked Plaintiff to meet with him prior to the disciplinary

meeting that Gallivan had arranged to occur on January 9, 2012.  Fletch did meet with

Plaintiff on January 9, 2012 prior to the scheduled meeting with Gallivan, and discussed

The News' evidence pertaining to the charged violations of Mailroom Rules 6 and 10,

and the Anti-Harassment Policy, as well as the evidence supporting Plaintiff's version of

the events.  Present at the January 9, 2012 disciplinary meeting were Plaintiff, Gallivan,

Union President Cannizzaro, Fletch, and Johnson.  Accordingly, Plaintiff was afforded

Union representation at every step of the disciplinary process.

   Nor was the Union's determination not to file any grievance challenging Plaintiff's

discharge arbitrary, discriminatory, or in bad faith.  Rather, the evidence in the record

establishes that after Plaintiff was discharge on January 9, 2012, Fletch reviewed all the

evidence and arguments presented by The News, as well as Fletch's own investigation

and determined that Plaintiff's text messages to Greiner were indefensible under the

Anti-Harassment Policy, and that Plaintiff's conduct in sending the text messages was neither provoked or in any way justified.  Fletch also considered the testimony by other employees of The News and concluded that any grievance pursued by the Union would be fruitless because the termination of Plaintiff's employment would only be upheld. Fletch then recommended to Cannizzaro that the Union not file any grievance regarding The News' termination of Plaintiff's employment.  Fletch and Cannizzaro also discussed Fletch's recommendation with the Union's Printing Sector President Daniel Wasser ("Wasser"), who concurred with the decision not to pursue any grievance.  Fletch then contacted Plaintiff and advised her of the Union's decision not to file a grievance. Significantly, Plaintiff has provided no evidence calling into question the adequacy of the Union's representation and investigation.  Significantly, even if erroneous, the Union's failure to not pursue a grievance regarding the applicability of the Mailroom Rules and Anti-Harassment Policy to conduct occurring outside the workplace is not actionable. *Vaughn*, 604 F.3d at 709.  There thus is no evidence in the record that the Union breached its duty of fair representation in determining that filing a grievance challenging Plaintiff's discharge was futile and the second prong of Plaintiff's unfair labor practice claim also fails.

Accordingly, summary judgment should be GRANTED in favor of Defendants on Plaintiff's unfair labor practice claim.

## CONCLUSION

Based on the foregoing, Defendant Buffalo News' motion for summary judgment (Doc. No. 99) should be GRANTED; Defendant CWA Local 81's motion for summary judgment (Doc. No. 100) should be GRANTED; the Clerk of the Court should be directed to close the file.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      March 9<u>th</u>, 2016
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

<u>**Failure to file objections within the specified time or to request an**</u>
<u>**extension of such time waives the right to appeal the District Court's Order.**</u>
*Thomas v. Arn*,  474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:       March 9<u>th</u>, 2016
                    Buffalo, New York